ACCEPTED
05-15-00060-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
9/1/2015 11:09:17 AM
LISA MATZ
CLERK

*The State Requests Argument*
*Only If Appellant Argues*

**Nos. 05-15-00060-CR**
**05-15-00061-CR**
**05-15-00062-CR**
**05-15-00063-CR**

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS

9/1/2015 11:09:17 AM

LISA MATZ
Clerk

**IN THE COURT OF APPEALS**
**FOR THE FIFTH DISTRICT OF TEXAS**
**AT DALLAS**

=====================

**MARK ANTHONY JOHNSON,**
**Appellant**


**v.**


**STATE OF TEXAS,**
**Appellee**

=====================

*On appeal from the Criminal District Court No. 2*
*Dallas County, Texas*
*Cause Numbers F13-59739-I, F13-59740-I, F13-59741-I, F13-59742-I*

=====================

**STATE'S BRIEF**

=====================

*Counsel of Record:*

SUSAN HAWK                          ANNE B. WETHERHOLT - 21235300
*Criminal District Attorney*          ANNE.WETHERHOLT@dallascounty.org
DALLAS COUNTY, TEXAS              *Assistant District Attorney*
                                    DALLAS COUNTY, TEXAS

133 N. RIVERFRONT BOULEVARD
LOCK BOX 19
DALLAS, TEXAS 75207-4399
(214) 653-3625
FAX (214) 653-3643


ATTORNEYS FOR THE STATE OF TEXAS

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ........................................................................................ ii

STATEMENT OF THE CASE ......................................................................................1

STATEMENT OF FACTS ..........................................................................................2

SUMMARY OF STATE'S ARGUMENT..........................................................................9

ARGUMENTS........................................................................................................10

    I. (Response to Issue 1) ...............................................................................10

    APPELLANT WAS NOT DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL. DEFENSE COUNSEL WAS FULLY AWARE OF THE ISSUE AND MADE A STRATEGIC DECISION TO KEEP THE 12TH JUROR ON THE JURY.

    II. (Response to Issue 2) (Cause number 05-15-00061-CR, only) ..............20

    THE EVIDENCE IS LEGALLY SUFFICIENT TO PROVE THAT COMPLAINANT PATRICIA SMITH "WAS EITHER APPELLANT'S FAMILY MEMBER, OR A MEMBER OF APPELLANT'S HOUSEHOLD OR AN INDIVIDUAL WITH WHOM APPELLANT HAD A DATING RELATIONSHIP."

STATE'S CROSS-POINT .........................................................................................26

    IN ALL FOUR CASES, THIS COURT SHOULD REFORM THE JUDGMENT TO CORRECTLY SHOW A SPECIAL FINDING OF FAMILY VIOLENCE.

PRAYER ..............................................................................................................27

CERTIFICATE OF SERVICE AND CERTIFICATE OF WORD COMPLIANCE .......................27

# INDEX OF AUTHORITIES

**Cases**

*Blankenship v. State*,
 780 S.W.2d 198 (Tex. Crim. App. 1989)...................................................... 22

*Bone v. State,*
 77 S.W.3d 828 (Tex. Crim. App. 2002)...................................................... 16

*Brooks v. State,*
 323 S.W.3d 893 (Tex. Crim. App. 2010)................................................ 21, 22

*Chambers v. State*,
 805 S.W.2d 459 (Tex. Crim. App. 1991)...................................................... 21

*Clayton v. State,*
 235 S.W.3d 772 (Tex. Crim. App. 2007)...................................................... 22

*Delrio v. State*,
 840 S.W.2d 443 (Tex. Crim. App. 1992)................................................ 15, 18

*Ex parte Kunkle*,
 852 S.W.2d 499 (Tex. Crim. App. 1993)...................................................... 15

*Ex parte Walker*,
 777 S.W.2d 427 (Tex. Crim. App. 1989)...................................................... 15

*Fernandez v. State*,
 805 S.W.2d 451 (Tex. Crim. App. 1991)...................................................... 22

*Garza v. State,*
 213 S.W.3d 338 (Tex. Crim. App. 2007)................................................ 14, 15

*Geesa v. State*,
 820 S.W.2d 154 (Tex. Crim. App. 1991)...................................................... 23

*Hernandez v. State*,
 726 S.W.2d 53 (Tex. Crim. App. 1986)...................................................... 14

*Hernandez v. State*,
 988 S.W.2d 770 (Tex. Crim. App. 1999)...................................................... 14

*Isassi v. State,*
330 S.W.3d 633 (Tex. Crim. App. 2010)................................................ 22, 23

*Jackson v. State*,
672 S.W.2d 801 (Tex. Crim. App. 1982)..................................................... 22

*Jackson v. Virginia*,
443 U.S. 307 (1979) .................................................................................... 21

*Laster v. State,*
275 S.W.3d 512 (Tex. Crim. App. 2009)..................................................... 23

*Mattias v. State*,
731 S.W.2d 936 (Tex. Crim. App. 1987)..................................................... 22

*Merritt v. State,*
368 S.W.3d 516 (Tex. Crim. App. 2012)..................................................... 22

*Miles v. State*,
918 S.W.2d 511 (Tex. Crim. App.  1996)..................................................... 21

*Mooney v. State*,
817 S.W.2d 693 (Tex. Crim. App. 1991)..................................................... 14

*Roberson v. State*,
852 S.W.2d 508 (Tex. Crim. App. 1993)..................................................... 16

*Rodriguez v. State*,
899 S.W.2d 658 (Tex. Crim. App. 1995)..................................................... 15

*State v. Morales,*
253 S.W.3d 686 (Tex. Crim. App. 2008)......................................... 16, 18, 19

*Strickland v. Washington*,
466 U.S. 668 (1984) .............................................................................. 14, 16

*Thompson v. State*,
9 S.W.3d 808 (Tex. Crim. App. 1999)......................................................... 16

*Wise v. State*,
364 S.W.3d 900 (Tex. Crim. App. 2012)..................................................... 23

*Yzaguirre v. State*,
     957 S.W.2d 38 (Tex. Crim. App. 1997) ......................................................... 16

**Statutes**

Tex. Code Crim. Proc. Ann. art. 35.16(a)(5) ......................................................... 17

**TO THE HONORABLE COURT OF APPEALS:**

The State of Texas submits this brief in reply to the brief of appellant, Mark Anthony Johnson.

## STATEMENT OF THE CASE

Appellant pled not guilty, and a jury convicted him of aggravated assault with a deadly weapon in each case. The complainants in these cases are Tracy Henderson (CR1: 7), her daughter Patricia Smith (CR2: 7), her son Elijah Hardy (CR3: 7), and her other daughter Shamyra Henderson (CR4: 7). All four of the indictments alleged that appellant used and exhibited a deadly weapon, a machete. (CR1: 7, CR2: 7, CR3: 7, CR4: 7). All four of the indictments alleged that appellant "has and [or] has had a dating relationship with the said complainant and [or] the said defendant was a member of the complainant's family and [or] household." (CR1: 7, 61, CR2: 7, 53, CR3: 7, 49, CR4: 7, 50). The jury found appellant guilty as charged in the indictments. (CR1: 65, (CR2: 57, CR3: 53, CR4: 54, RR3: 184).

The jury set punishment at confinement for seven years in each case. (CR1: 49, CR2: 38, CR3: 38, CR4: 39).[1]

---

[1] The State will refer to the clerk's record for F13-59739-I/05-15-00060-CR as "CR1," to the clerk's record for F13-59740-I/05-15-00061-CR as "CR2," to the clerk's record for F13-59741-I/05-15-00062-CR as "CR3," and to the clerk's record for F13-59742-I/05-15-00063-CR as "CR4."

Shamyra Henderson, sixteen years old, was living with her mother, Tracy Henderson, and her mother's boyfriend, appellant Mark Johnson, on August 29, 2013. (RR3: 15). They lived in an apartment at 9797 Bruton Road in Dallas. (RR3: 20). Also living in the two bedroom apartment were her older sister, Patricia Smith, her younger brother, Elijah Hardy, and her toddler-age niece. (RR3: 15-16). Shamyra, Patricia, and Elijah were in school. (RR3: 41). Her mother and appellant shared a bedroom, and she and her siblings shared a bedroom. (RR3: 16). They had been living in the apartment for a few months. (RR3: 17). Shamyra said that appellant was in a dating relationship with her mother, Tracy Henderson. (RR3: 17). This was appellant's apartment, and he decided he wanted them to move out. (RR3: 33).

On August 29th, appellant arrived home about 11 p.m. (RR3: 18). He beat on the door and Shamyra let him inside. (RR3: 18). Appellant was angry, went to her mom Tracy Henderson's bedroom real fast, where her mom was lying in bed, and slammed the door closed. (RR3: 19, 42). Shamyra heard her mom arguing with appellant in the bedroom, so she went inside to see what was wrong. She saw her mom on her knees. (RR3: 20-21). Shamyra saw appellant go to the closet and grab a long rusty machete; the machete had belonged to Shamyra's grandfather. He gave it to Shamyra, and her mother brought it to the apartment. Her mother

kept it in her closet. (RR3: 22, 28, 41-42). Appellant raised the machete up like he was going to swing it at her mother, who grabbed appellant's arm to protect herself. Shamyra was afraid for her mother. Shamyra was also afraid for her own safety. (RR3: 23-24). Appellant was yelling that they needed to move out of his apartment. (RR3: 40).

At that point, Shamyra's sister, Patricia Smith, and brother, Elijah Hardy, walked into the bedroom. (RR3: 24, 26). Her brother leaned his hand on the television and appellant swung the machete toward the television, causing her brother to quickly move his hand. (RR3: 25-26). The machete cut the television. (RR3: 26). Shamyra went to the living room to get a stool to protect herself and to push appellant back. Appellant swung at her hard and damaged the stool. Shamyra thought appellant was trying to kill her. She felt threatened every time appellant swung the machete at her, her mother, her brother and her sister, who were all still in the bedroom with appellant. She felt that the lives of her and her family were all in danger. (RR3: 26-27, 37, 39, 48). Then Patricia left the room and went to the living room to call police. (RR3: 27, 29). Everyone else also went to the living room, with appellant following them. (RR3: 29). Appellant swung the machete at Patricia; she moved away and the machete hit the counter, putting a slice in the counter. (RR3: 29-30). Then appellant threw the machete on the floor and went back to the bedroom. Shamyra's mom picked up the machete. (RR30-

3

32).  Shamyra was scared for her mother's safety, for her own safety, and for the safety of her brother Elijah, her sister Patricia, and her niece.  (RR3: 31-32).  Then things calmed down because police arrived.  (RR3: 31).  Her mom and sister Patricia talked to police.  (RR3: 33).  Shamyra believed that by appellant swinging the machete at her, her mother Tracy, her sister Patricia, and her brother Elijah, he could have caused them bodily injury or death.  (RR3: 34).  State's Exhibits 1 through 6 showed the front door, the television, the stool, the countertop, and the machete.  (RR3: 35).

Tracy Henderson, the mother of Shamyra, Patricia, and Elijah, testified that she was in a dating relationship with the appellant.  She and appellant had been in that relationship for almost a year.  She was in the process of divorcing her husband.  (RR3: 50-51). She was living with her children.  About four months after they began their dating relationship, appellant moved in with her and her children in a not-so-great neighborhood.  Then he rented an apartment in a better area for them, and they moved into appellant's apartment.  (RR3: 50-53).  Appellant paid for rent and utilities, and Tracy paid for groceries.  (RR3: 54).  Appellant asked her to marry him and she agreed.  (RR3: 55).

About a month later, appellant asked her and her children to move out of his apartment if she did not get a job.  (RR3: 55).  She got a job as a home health care aide.  (RR3: 55-56).  After about two weeks, while she was working and getting

4

income, appellant told her he still wanted her and her children to move out. She told him she would as soon as she got enough money. (RR3: 56). At first appellant was okay with that arrangement, but then their relationship got worse. There was tension in the apartment because he wanted them to move out. (RR3: 57). The names on the apartment lease were those of appellant and Tracy's two daughters – Shamyra and Patricia. (RR3: 57). Tracy and her children were living with appellant in the same household. (RR3: 74).

About 11 p.m. on August 29, 2013, Tracy was asleep in the master bedroom that she shared with appellant. Her children were in their room. Appellant came into the apartment. He was angry, talking loud, cursing, and telling her that he wanted them to move out. (RR3: 58-59). She thought he was intoxicated. (RR3: 76). She stayed in bed. Appellant came into the bedroom, jumped/flopped on the bed to lie down, and he intentionally hit her in her back with a closed fist. It hurt her, and she slapped him in his face. He hit her again – a punch – and she fell out of bed. It was painful. (RR3: 59-60, 83). She got up to hit him back, and he kicked her in the chest with both feet. She hit the wall. (RR3: 62, 83). Appellant went into the closet as she was crawling around the vanity to give her leverage to get up. Appellant knew that there was a machete in the closet. Appellant got Shamyra's machete, made by her welder grandfather and given to her as a gift, from the top shelf of the closet. (RR3: 63). Tracy was in fear of her life when he

5

grabbed the machete. (RR3: 65).

Shamyra entered the bedroom and told appellant he was not going to put his hands on her mother. Appellant argued with Shamyra. Then he looked at Tracy and swung the machete at Tracy. (RR3: 63-65). Tracy grabbed his hand to stop the momentum of the machete because she was afraid it would hit her and slice her. (RR3: 67). Appellant pulled her up while she was holding on to the machete. (RR3: 67). He pushed her off of him. At this point, Shamyra got the stool to defend her mother and herself. Appellant ran behind her with the machete. She was pushing him back and hitting at him with the stool, and he was chopping at Shamyra and the stool with the machete. Tracy thought her life and the life of Shamyra were being threatened by appellant. The other children, Elijah and Patricia, came into the room. Tracy thought appellant was going to kill her and her children. (RR3: 67-69, 77).

When Elijah demanded to know why appellant was doing this, appellant swung the machete at Elijah. Elijah's hand was on the television, but Elijah moved his hand in time, so the machete hit the television instead of Elijah's hand. (RR3: 70). Patricia asked Tracy if she wanted Patricia to call the police; Tracy told her yes. As Patricia went toward the living room to get the phone, and went into the kitchen to make the call, appellant went after Patricia. The other family members followed appellant, and Tracy grabbed a stool to defend them all by

6

hitting appellant in the back. (RR3: 70). When appellant saw that Patricia was calling the police, he swung the machete at her, but he hit the counter. (RR3: 71). Tracy heard Patricia talk to the 911 operator. The recorded call with Patricia telling the police what was occurring was admitted as State's Exhibit 7. (RR3: 73-74).

During this entire incident, appellant swung the machete at Tracy, Shamyra, Elijah, and Patricia and threatened all of them with the machete. (RR3: 71). After Patricia called the police, appellant started calming down. He went back to the bedroom, got his wallet, put his shirt on, and sat down by her on the couch. Tracy grabbed the machete out of his hand and put it on the other side of her. (RR3: 72).

Elijah Hardy and Patricia Smith were at court and available to testify. (RR3: 45-46).

The responding Dallas police officer, Colwin Dennis, also testified. (RR3: 88). At the apartment, it was a bit chaotic. Tracy Henderson was crying. (RR3: 91). She appeared to be under the stress of what had transpired. (RR3: 92). He also talked to the children, Patricia Smith, Shamyra Henderson, and Elijah Hardy. They were all upset and crying, especially the two girls. (RR3: 94). He learned what occurred and a machete was involved. (RR3: 92-93). They said appellant was chasing them around with the machete, and they felt threatened by the

machete. (RR3: 95-96). A machete is a deadly weapon. (RR3: 93, 97). There was damage to property in the apartment. (RR3: 98, 101).

Appellant chose to testify in his own behalf. (RR3: 108-148). When he got home, he was not intoxicated. He ate in the kitchen. Tracy was asleep in the bedroom. The children were in the living room. He went to the bedroom, got in bed, and fell asleep. About an hour later he heard a boom. He grabbed the machete from the closet. He went into the living room and saw that Elijah and Patricia were arguing and fighting. (RR3: 111-113). Shamyra was there, also. (RR3: 125). He noticed Patricia had called 911 and was recording him on the cell phone. She said she was going to put the recording on YouTube under "stepdaddy drama." (RR3: 114-115, 124, 131). He had the machete in his hand. (RR3: 126). He got angry with Patricia because she was on the phone with the police and he started hitting the stool with the machete and accidently hit the top of the kitchen counter/bar. (RR3: 117-118, 127). He said he never struck the television. (RR3 128). Appellant denied having a fight with Tracy Henderson that night. (RR3: 115). She stayed in the bedroom the whole time until after he struck the stool and the bar. (RR3 128-129). He denied hitting or kicking her. (RR3: 119). He said Tracy Henderson was not telling the truth about him hitting, kicking, or swinging the machete. (RR3: 120). When police arrived, everyone was calm. (RR3: 129).

After appellant testified, Elijah Hardy, the young son, testified. Appellant

8

was his mother's ex-boyfriend. (RR3: 149). He and his sisters were in their room talking. They heard loud banging noises on the door. Shamyra answered the door and appellant came inside the apartment. (RR3: 150-151). None of the other children were in the living room at that time, and Elijah did not have an argument with Patricia at that time. He and Patricia were not causing a commotion in the living room. (RR3: 153, 156-157). Elijah believed appellant was intoxicated. He slurred his words, and stumbled when he walked. (RR3; 161-162). Appellant went into the bedroom he shared with their mother. (RR3: 152). Elijah heard their mom telling appellant to leave her alone. He heard a commotion between them. Shamyra went to see what was happening. Patricia followed her. Then Elijah followed them all into his mom's bedroom. (RR3: 152). Elijah saw appellant swing the machete at him. (RR3: 154). He told appellant to put the machete down and leave his mom alone. Appellant looked at Elijah and swung the machete at Elijah's hand, which was on the television. Elijah moved his hand out of the way, and the machete cut the television. (RR3: 154-155). Appellant also swung the machete at Shamyra, who was holding a stool, and it hit the stool. (RR3: 155).

## SUMMARY OF STATE'S ARGUMENT

*Issue 1:* Appellant was not denied his constitutional right to the effective assistance of counsel. Defense counsel was fully aware of the issue and made a strategic decision to keep the 12th Juror on the jury.

9

*Issue 2 (Cause Number F13-59740-I/05-15-00061-CR, only):*  The evidence is legally sufficient to prove that complainant Patricia Smith "was either appellant's family member, or a member of appellant's household or an individual with whom appellant had a dating relationship."

*State's Cross-point:*  In all four cases, this court should reform the judgment to correctly show a special finding of family violence.

## ARGUMENT

## I.

### (Response to Issue 1, in all cause numbers)

APPELLANT WAS NOT DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL. DEFENSE COUNSEL WAS FULLY AWARE OF THE ISSUE AND MADE A STRATEGIC DECISION TO KEEP THE 12TH JUROR ON THE JURY.

Appellant alleges in all cause numbers that he was denied his constitutional right to the effective assistance of counsel because trial counsel failed to strike the 12th Juror, who suffered from a lack of short term memory.  This juror informed the court about her concern that she would not be able to take her notes into the jury room during deliberations.  She was thoroughly questioned.  The parties decided that she was not disqualified, and defense counsel made a strategic decision to keep her on the jury.  Appellant has not met his burden of showing that

he was denied his constitutional right to the effective assistance of counsel.

## Facts

After voir dire was conducted, the parties exercised their peremptory strikes. (RR2: 80). The court read the names of the jurors who had been struck by the parties. (RR2: 81-82). The court read the names of the persons on the jury. The 12th juror was prospective juror Number 45 on the panel, Jean Cherry. (RR2: 82-83). Neither party had any objections to this jury. (RR2: 82). After the excused prospective jurors left the courtroom, the judge told the jurors that they could take notes, but the notes would be taken from them before they went to deliberate, so they needed to pay attention to the testimony. (RR2: 84). The judge asked the jurors to give their cell phone numbers to the bailiff so they could be reached if necessary. (RR2: 85). The judge told the jurors to return the next morning, and the court was in recess. (RR2: 85-86).

The 12th juror, Jean Cherry, returned to the courtroom after telling the bailiff that she could not remember her daughter's cell phone number; her daughter was going to pick her up. (RR2: 86). She could remember her own cell phone number and she had her daughter's cell phone number written down. (RR2: 86-87). Cherry explained that she could drive when she is familiar with the area; driving to the courthouse was too complex. She could drive to the grocery store, to church, and to visit her friends. (RR2: 87). She paid all her own bills. (RR2: 87).

Juror Cherry informed the court that she had short term memory problems and had to write everything down. She would have to take notes during the trial. (RR2: 87). It would be helpful if she could take her notes back with her for deliberation; without them she would have forgotten some things, but not everything. (RR2: 88). The prosecutor told her that the trial would consist of about two hours of testimony. (RR2: 88). When asked if she could effectively deliberate without her notes, she said, "*Yes.* But I mean if - - if they would you know, if I could trust them to fill me in as we talked - - ". (RR2: 88). It was possible she could manage. (RR2: 88-89). Cherry explained that she had had a good career working at SMU. She could do anything; she edited all the graduates' theses. She had a brain "like a mountain" but now she didn't and it filled her with fear because she can't remember "everything." (RR2: 89). She added, "I mean, that's - - that's the emotion. I mean, it's not that I can't do things, but there are things that I can't do anymore that I used to be able to do." (RR2: 89). She hoped that she would not have anxiety in the jury room while trying to remember things she had just heard. (RR2: 89). Being able to take notes but not being able to take them to the jury room would not be helpful because she would not be able to look at them while they were talking. (RR2: 90). Defense counsel had no questions for her. (RR2: 90).

The judge asked Juror Cherry if she thought she could do this. She said,

I really don't. I'm terrified. I'm just terrified *because I don't know what to expect.* I mean, I'm functioning. I drive my car. I pay all my bills. I can - - I can navigate in most - - you know, I can go to my friend's house. I can go to the church. I can't drive down here. My daughter would have to bring me.

(RR2: 91). The judge pointed out that a lot of people could not drive to the courthouse because of all the construction. (RR2: 91). Cherry responded, "I know. That's what I mean. I'm just completely bewildered there." (RR2: 91). After Juror Cherry left the courtroom, the judge and the parties had an off-the-record discussion. (RR2: 91). In open court without any jurors present, the judge reviewed what Juror Cherry had said, and *noted "she had a big book that she was down here reading*." (RR2: 91-92).

Defense counsel stated,

What I didn't hear her say is that she had given a durable power of attorney to help in her decisions to someone in the family, which means she's in control in the details of her life. So I think she's - - even though she's got issues, *I don't think it's severe enough.*

(RR2: 92). The judge asked for the position of the parties on the matter. The prosecutor deferred to the court, adding: "Defense counsel is stating that he's okay with the juror remaining on the panel, which is fine with the State as well." (RR2: 92). The prosecutor, defense counsel, and the court indicated that by keeping Juror Cherry, he would be waiving his right to appeal this issue. (RR2: 92) (emphasis added).

13

The next day, the prosecutor wanted to clarify that defense counsel made a strategic assessment of Juror Cherry's ability to be a good and fair juror, and he did not take any issue with this juror. (RR3: 7). *Defense counsel stated: "Yes. Yes, I did."* (RR3: 7) (emphasis added). When defense counsel was asked by the prosecutor it he had made a strategic assessment of Cherry's ability to be a good and fair juror, he responded, *"That's my judgment, yes."* (RR3: 7) (emphasis added).

When the prosecutor asked the judge if he thought Cherry was capable of sitting as a juror, he answered, "I do. And, in fact, you know, she had a book, a mystery book she was carrying around, so . . ." (RR3: 8).

**Law**

Texas has adopted the federal constitutional standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984), and does not apply a higher standard. *Hernandez v. State*, 988 S.W.2d 770 (Tex. Crim. App. 1999); *Hernandez v. State*, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986). To show counsel was constitutionally ineffective, appellant must prove that counsel's performance was deficient and that the deficient performance prejudiced appellant's defense. *Garza v. State,* 213 S.W.3d 338, 347 (Tex. Crim. App. 2007); *Mooney v. State*, 817 S.W.2d 693, 697 (Tex. Crim. App. 1991). *Strickland* sets out a two part analysis: (1) did the attorney's performance fail to constitute "reasonably effective

14

assistance," *i.e.,* did the defense attorney's representation fall below an objective standard of reasonableness under prevailing professional norms, and (2) if so, was there a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different? *Ex parte Walker*, 777 S.W.2d 427, 430 (Tex. Crim. App. 1989).

Under *Strickland,* appellate review of trial counsel's representation is highly deferential and presumes that counsel's actions fell within the wide range of reasonable and professional assistance. *Garza,* 213 S.W.3d at 348. The standard of review for effectiveness of counsel is gauged by the totality of the representation of the accused. *Rodriguez v. State*, 899 S.W.2d 658, 665 (Tex. Crim. App. 1995). In determining whether ineffective assistance of counsel has been shown, courts presume that trial counsel "made all significant decisions in the exercise of reasonable professional judgment." *Delrio v. State*, 840 S.W.2d 443, 447 (Tex. Crim. App. 1992).

Moreover, the right to the effective assistance of counsel means the right to "reasonably effective assistance" and does not guarantee errorless counsel or counsel whose competency is judged by hindsight. *Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex. Crim. App. 1993). Rather, the right to effective assistance of counsel means counsel reasonably likely to render reasonably effective assistance of counsel. *Kunkle*, 852 S.W.2d at 505.

In order for a defendant to meet his burden with respect to the first prong of *Strickland*, he must overcome that presumption. *Roberson v. State*, 852 S.W.2d 508, 510 (Tex. Crim. App. 1993); *Strickland,* 466 U.S. at 690. The burden of showing ineffective assistance is on appellant. *Yzaguirre v. State*, 957 S.W.2d 38, 39 (Tex. Crim. App. 1997). An appellant has the burden of rebutting the presumption of adequate assistance of counsel with evidence, not allegations. *Roberson*, 852 S.W.2d at 510 (stating, "without any evidence in the record to demonstrate otherwise, we must presume counsel had a plausible reason for not pursuing identification of the informant"). Defense counsel should ordinarily be accorded an opportunity to explain his actions before being condemned as unprofessional and incompetent. *Bone v. State,* 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Without evidence of the strategy involved concerning counsel's actions at trial, the reviewing court will presume sound trial strategy. *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).

A reviewing court should presume that trial counsel's performance was constitutionally adequate "unless the challenged conduct was so outrageous that no competent attorney would have engaged in it." *State v. Morales,* 253 S.W.3d 686, 696-697 (Tex. Crim. App. 2008).

### Application

Appellant claims that defense counsel was constitutionally ineffective

because he should have moved to have Juror Cherry disqualified because she suffered from a lack of short term memory. Appellant relies on hindsight and a cold record in his assertion.

The record reflects that after talking to Juror Cherry, the parties and the judge, who all viewed her in person and listened to her responses, determined that she was competent to be a juror. Juror Cherry was a highly intelligent person who had had a successful career in academia, but she feared that her skills had become somewhat diminished. Like many people, she became nervous when she had to leave her comfort zone. Unlike many people, however, who silently fret but do not voice their concerns when they have to drive to unfamiliar places, on unfamiliar roads, and engage in unexpected actions, Cherry was so conscientious that she felt compelled to tell the court about her worries. Her testimony merely shows that although she was nervous and afraid when she had to deal with unknown circumstances, she was fully capable of performing her duties as a juror. Contrary to appellant's claim on appeal, she would not have been subject to a challenge for cause as being an unfit juror under Tex. Code Crim. Proc. Ann. art. 35.16(a)(5).

More significantly, defense counsel had seen the makeup of the jury panel and exercised peremptory strikes. He wanted Juror Cherry on his jury. Because the right to an impartial jury is a right which is to be exercised at the option of the

defendant, it is also subject to the legitimate strategic or tactical decision-making processes of defense counsel during the course of trial. *Morales,* 253 S.W.3d at 697. With respect a claim of ineffective assistance for failure to exercise a peremptory challenge, the Court of Criminal Appeals has said that waiver of trial counsel's client's right to insist that every juror in the case be in all things fair and impartial may, in counsel's best professional judgment, have been an acceptable gamble. *Morales,* 253 S.W.3d at 697; *see also Delrio v. State,* 840 S.W.2d at 447. The Court added, quoting *Delrio*, "Consistent with *Strickland*, we must presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that he made all significant decisions in the exercise of reasonable professional judgment." *Morales,* 253 S.W.3d at 697.

In the instant case, trial counsel chose to proceed with a jury containing Juror Cherry rather than to ask to proceed with eleven jurors. Defense counsel *repeatedly* told the court after the discussion with Cherry, that his decision to proceed with Jury Cherry as the 12th juror was a *strategic decision.* (RR3: 7-8).

Appellate analysis of ineffective assistance of counsel claims requires a determination of whether defense counsel's decision was part of his strategy. Contrary to appellant's contention, the State's asking defense counsel if he had made a strategic assessment was *not* "a calculated attempt on its part to circumvent/negate an obvious *Strickland* claim by Appellant." Appellant's Brief

18

at pp. 16-17. Putting that factor on the record at trial, rather than subsequently in a motion for new trial or in a writ of habeas corpus, so that the claim can be adequately analyzed, was the most efficient use of the court's time and resources.

In any event, trial counsel was fully aware of the issue with respect to Juror Cherry. He saw her in person, gauged her demeanor and responses to his questions during voir dire, and listened to her as she was questioned about her concerns. He made a strategic decision that he wanted her on the jury. Because he made a strategic decision that he wanted her on the jury, appellant has not presented any evidence that trial counsel was constitutionally ineffective. *See Morales,* 253 S.W.3d at 698-699 ("Even if it is appropriate to regard [the prospective juror] as impliedly biased under the Sixth Amendment, that does not ipso facto establish that trial counsel could not make a legitimate tactical decision to keep her on the appellant's jury."). It is of no legal or constitutional consequence that a different defense attorney, in hindsight, might have chosen a different strategy as to which jurors to have on the jury.

It should also be noted that because the judge decided that this juror was fully competent to sit on the jury, even if appellant had made a motion to have her disqualified, the court would likely have, in its sound discretion, denied his request. Therefore, even if he had made a motion to disqualify Juror Cherry, the result would not have been different. Juror Cherry would still have been on the

jury.

Appellant has failed to meet his burden of showing that he was denied his constitutional right to the effective assistance of counsel. This issue should be overruled.

## II.

### (Response to Issue 2, Cause Number F13-59740-I/05-15-00061-CR, only)

> THE EVIDENCE IS LEGALLY SUFFICIENT TO PROVE THAT COMPLAINANT PATRICIA SMITH "WAS EITHER APPELLANT'S FAMILY MEMBER, OR A MEMBER OF APPELLANT'S HOUSEHOLD OR AN INDIVIDUAL WITH WHOM APPELLANT HAD A DATING RELATIONSHIP."

Appellant alleges that as to cause number F13-59740-I/05-15-00061-CR, only, the evidence was constitutionally insufficient to prove that complainant Patricia Smith "was either Appellant's family member, or a member of Appellant's household or an individual with whom Appellant had a dating relationship" because Patricia Smith did not testify in the trial. (Appellant's Brief at p. 23, 29). All of the evidence, and testimony from other complainants and witnesses was legally sufficient to prove that appellant has or has had a dating relationship with the said complainant or that appellant was a member of the complainant's family or household.

20

## Facts

Appellant was charged with aggravated assault with a deadly weapon, a machete, in all four cases. This issue concerns the only indictment in which Patricia Smith is the complainant. The prosecutor told the jury in her opening statement that the jurors would hear testimony from two to four witnesses. The reason for that number was "at some point their testimony could become redundant because they were there at the same time experiencing the same thing." (RR3: 11).

## Law

In reviewing the legal sufficiency of the evidence, the court looks at all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-319 (1979); *Brooks v. State,* 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The appellate court must review all the evidence brought before the trier of fact, including evidence which may have been improperly admitted, *e.g*., hearsay, seized evidence, confession. *Miles v. State*, 918 S.W.2d 511, 512 (Tex. Crim. App. 1996); *Chambers v. State*, 805 S.W.2d 459, 460 (Tex. Crim. App. 1991). The reviewing court may not use a "divide-and-conquer" approach, separating each piece of evidence offered to support an appellant's conviction, followed by speculation on the evidence the

State did not present. *See Merritt v. State,* 368 S.W.3d 516, 526, 527 (Tex. Crim. App. 2012). The reviewing court may not use this approach to systematically isolate and then discount the evidence supporting conviction. *Clayton v. State,* 235 S.W.3d 772, 779 (Tex. Crim. App. 2007).

Viewing the evidence "in the light most favorable to the verdict" under a legal-sufficiency standard means that the reviewing court is required to defer to the trier of fact's determinations of credibility and weight because the trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Brooks,* 323 S.W.3d at 899. The trier of fact is not required to believe defensive evidence even if it is uncontroverted. *See Mattias v. State*, 731 S.W.2d 936, 940 (Tex. Crim. App. 1987). Credibility of allegedly inconsistent testimony is for the trier of fact; the trier of fact is free to resolve any inconsistencies in favor of the State's evidence. *Jackson v. State*, 672 S.W.2d 801, 804 (Tex. Crim. App. 1982).

It is not the role of the appellate court to become a thirteenth juror. *Isassi v. State,* 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Fernandez v. State*, 805 S.W.2d 451, 456 (Tex. Crim. App. 1991); *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1989)(on rehearing). The appellate court may not re-evaluate the weight and credibility of the record evidence and thereby substitute its judgment for that of the fact finder. *Isassi,* 330 S.W.3d at 638. Credibility is to

22

be weighed and decided by the trier of fact, which views the witness, not a cold record upon appellate review. *See Laster v. State,* 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (stating, "During such a review, an appellate court must not usurp the role of the factfinder. Appellate courts are ill-equipped to weigh the evidence; unlike the factfinder--who can observe facial expressions and hear voice inflections first-hand--an appellate court is limited to the cold record."). The appellate court must defer to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Isassi,* 330 S.W.3d at 638. This same standard applies equally to circumstantial and direct evidence. *Isassi,* 330 S.W.3d at 638.

The role of the appellate court on appeal is restricted to guarding against the rare occurrence when a factfinder does not act rationally. *Isassi,* 330 S.W.3d at 638. The evidence is sufficient if *any* rational trier of fact could have found the essential elements beyond a reasonable doubt, not whether the reviewing court would so find. *See Geesa v. State*, 820 S.W.2d 154, 159 n. 6 (Tex. Crim. App. 1991); *see also Wise v. State,* 364 S.W.3d 900, 902 (Tex. Crim. App. 2012) (holding that the court of appeals erred by focusing on possible alternative explanations).

## Analysis

The jury was given the definitions of "Dating Relationship," "Family,"

"Household," and relationships. (CR1: 60, CR2: 52, CR3: 48, CR4: 49). The jury was properly instructed in the alternative that to determine whether, beyond a reasonable doubt, appellant "has or has had a dating relationship with the said complainant or the said defendant was a member of the complainant's family or household." (CR1: 61, CR2: 53, CR3: 49, CR4: 50).

Shamyra Henderson, sixteen years old, testified that she was living with her mother, Tracy Henderson, and her mother's boyfriend, appellant Mark Johnson, on August 29, 2013. Appellant was in a dating relationship with her mother, Tracy Henderson. *Also living in the two bedroom apartment* were her older sister, *Patricia Smith*, her younger brother, Elijah Hardy, and her toddler-age niece. Her mother, Tracy, and appellant shared a bedroom, and Tracy's children shared a bedroom. They had all been living in the apartment for a few months.

Tracy Henderson, the mother of Shamyra, Patricia, and Elijah, testified that she was in a dating relationship with the appellant. She and appellant had been in that relationship for almost a year. About four months after they began their dating relationship, he moved in with her and her children in a not-so-great neighborhood. He subsequently he rented an apartment in a better area for them, and they all moved into the apartment rented. Henderson testified that the *names on the apartment lease* were those of appellant and Tracy's two daughters – Shamyra and ***Patricia***. *Thus, Tracy and her children – including Patricia – were*

24

*living with appellant in the same household.*

On August 29th, appellant got angry at the family and started swinging a hatchet at each of them. During this entire incident, appellant swung the machete at Tracy, Shamyra, Elijah, and Patricia and threatened all of them with the machete. Shamyra, Tracy, and Elijah testified that they were afraid for their lives and the lives of their family members. Patricia left the room and went to the living room to call police. Everyone else also went to the living room, with appellant following them. *Appellant swung the machete at Patricia; she moved away and the machete hit the counter, putting a slice in the counter.* They all believed that by swinging the machete at each of them, appellant could have caused them bodily injury or death.

Patricia Smith was not required to testify for a rational trier of fact to find beyond a reasonable doubt from all of the evidence – the testimony from other complainants and witnesses – that all the elements of the offense of aggravated assault with a deadly weapon, a machete, were proved beyond a reasonable doubt, including that *defendant was a member of the complainant's family or household.* This issue should be overruled.

## STATE'S CROSS-POINT

IN ALL FOUR CASES, THIS COURT SHOULD REFORM THE JUDGMENT TO CORRECTLY SHOW A SPECIAL FINDING OF FAMILY VIOLENCE.

The jury instructions, which tracked the indictments in all four cause numbers, stated as to these aggravated assault deadly weapon cases that "the said defendant has or has had a dating relationship with the said complainant or the said defendant was a member of the complainant's family or household." (CR1: 7, 61, CR2: 7, 53, CR3: 7, 49, CR4: 7, 50). The jury found appellant guilty as charged in the indictments. (CR1: 65, (CR2: 57, CR3: 53, CR4: 54, RR3: 184). The Judgments of Conviction by Jury do not, however, contain such a finding. (CR1: 49-50, CR2: 38-39, CR3: 38-39, CR4: 39-40).

The State respectfully requests that the Judgment of Conviction by Jury in each case be reformed to correctly show that the court made the special finding or order of family violence: "The court finds that defendant was prosecuted for an offense under Title 5 of the Penal Code that involved family violence. Tex. Code Crim. Proc. art. 42.013."

## PRAYER

The State prays this Honorable Court will affirm, as modified, the judgment of the trial court.

Respectfully submitted,

/s/ *Anne B. Wetherholt*

SUSAN HAWK
*Criminal District Attorney*
STATE BAR NO. 00794284

ANNE B. WETHERHOLT
*Assistant District Attorney*
STATE BAR NO. 21235300
DALLAS COUNTY, TEXAS

FRANK CROWLEY COURTS BUILDING
133 N. RIVERFRONT BLVD., LB-19
DALLAS, TEXAS 75207-4399
(214) 653-3639
ANNE.WETHERHOLT@dallascounty.org
FAX (214) 653-3643

## CERTIFICATE OF SERVICE AND CERTIFICATE OF WORD COMPLIANCE

I certify that a true copy of the foregoing brief has been served on William T. Hughey, P.O. 2012 Marshall, Texas, 75671 and Pasquel A. Lee, 2201 Main Street Suite 400-10, Dallas,Texas 75201, Attorneys for Appellant, by sending an electronic communication through eFileTexas.gov to Hugheylaw@sbcglobal.net and Pat.lee@lawyer.com on September 1, 2015.

I further I certify that the total word count in this document, which is prepared in Microsoft Word 2010, is 6,951.

/s/ *Anne B. Wetherholt*
ANNE B. WETHERHOLT